BAKER CAR AND TRUCK RENTAL, INC.; Arelco, Inc.,
d/b/a National Car Rental; and Carco Rentals, Inc. *v.*
The CITY OF LITTLE ROCK, Arkansas, Acting By and
Through the Little Rock Municipal Airport Commission

95-1128                                    925 S.W.2d 780

Supreme Court of Arkansas
Opinion delivered July 15, 1996
[Petition for rehearing denied September 9, 1996.*]

*Special Chief Justice Josephine L. Hart would grant. Jesson, C.J., and Dudley, J., not participating.

*Friday, Eldredge & Clark*, by: *Harry A. Light*, for appellant Baker Car and Truck Rental, Inc.

*Stark, Dininger & Smith*, by: *William K. Byrum*; and *Davidson, Horne & Hollingsworth*, by: *Garland W. Binns*, for appellant Arelco, Inc., d/b/a National Car Rental.

*Hardin, Dawson & Terry*, by: *Robert M. Honea*, for appellant Carco Rentals, Inc.

*Kaplan, Brewer, & Maxey, P.A.*, by: *Philip E. Kaplan* and *JoAnn C. Maxey*, for appellee.

TOM GLAZE, Justice. This litigation arises out of leases entered into between the Little Rock Municipal Airport Commission and Avis, Hertz, and National car-rental businesses having concessions at the Little Rock Airport. These three car-rental businesses first entered into identical leases in 1971, and each had a ten-year rental term with an additional ten-year option, ending in 1991. In 1973, Hertz and National obtained a second option to renew for a five-year period, extending their lease terms to 1996. All of these and later leases entered into between the Commission and car-rental

businesses contained a clause referred to as a "most-favored-nations (MFN) clause." What interpretation and effect this clause should be given is the focus of this litigation. The clause reads as follows:

> That the concession granted by this agreement is not exclusive and lessor [Commission] shall have the right to deal with and perfect arrangements with any other individual company or corporation for engaging in like activity at the Airport; *provided, however, no other concession for auto rental operation shall be granted on more favorable terms and conditions than granted to the concessionaires [car-rental lessees] herein.* (Emphasis added.)

Avis[1], a franchisee of Baker Car and Truck Rental, Inc. (Baker), never invoked the MFN clause in its 1971 lease in an attempt to extend its 1971 lease to comport with the extended five-year term in the Hertz and National supplemental leases. Significantly, the Baker, Hertz, and National leases all contained concessionaire fees based upon a rate of $ .03 "per deplaning airline passenger" for the first 30,000 passengers per month and $2.75 for all deplaning passengers over 30,000.

What led to this legal dispute was the Commission's 1986 concessionaire lease with Budget Rent-A-Car. This lease gave Budget a ten-year term with two five-year renewal options, extending Budget's concession rights to 2006. Budget's lease contained the MFN clause and other terms and provisions in the above-mentioned, prior car-rental leases, including the concessionaire fee rate based upon deplaning airline passengers.[2] However, by the time Baker's 1971 lease expired in 1991, the Commission was reconsidering its car-rental concessionaire fees and how they should be computed. It proposed basing the concessionaire's fee upon the "percentage of the concessionaire's gross receipts" rather than upon the "number of deplaning passengers." This new formula or gross-receipts percentage rate concededly represents an increase in costs to the appellants' car-rental businesses by establishing a higher fee rate than that required under the Commission's deplaning-passenger formula. As a consequence, Baker rejected the Commission's new formula rate in the proposed new lease. Instead, Baker submitted

---

[1] For clarity, Avis will be referred to as Baker.

[2] Some differences exist between Budget's 1986 lease and the prior 1971 and 1973 leases. For example, the rates for terminal building space, parking space and ground rental space were higher and rental rate and fee review procedure differs in Budget's lease. The Budget lease also contains an additional leasehold improvements section not contained in the earlier leases.

that, under the MFN clause of its 1971 lease, its existing lease terms and conditions (including the "deplaning-passenger formula rate") had been *automatically extended* to 2006 when the Commission executed its twenty-year lease with Budget in 1986.

The Commission agreed to extend Baker's lease to 1996 to coincide with Hertz's and National's 1973 amended leases, but Baker rejected such an extension agreement because Baker believed its lease was automatically extended to the 2006 date provided in Budget's lease. After Baker rejected the Commission's proposed extension agreement, the Commission approved a new concession agreement providing that concession fees be based upon a percentage of gross receipts. It then informed Baker, Hertz, National, and Budget that, if they did not execute the Airport's new lease agreement when their existing agreements terminated, their rental space would be put up for bid. About nine months later, the Commission notified Baker that its tenancy would be terminated.

Baker filed suit in chancery court, seeking declaratory judgment and specific performance of the MFN clause and requesting its 1971 lease terms be extended to the 2006 termination date provided in Budget's lease. It also asked the chancery court to declare the new proposed "percentage of gross receipts" formula an illegal exaction. Hertz and National intervened, reasserting Baker's claims. The parties filed motions for summary judgment, but the chancellor granted the Commission's, thereby dismissing Baker's and its co-plaintiffs' complaint with prejudice.

On appeal, Baker, Hertz, and National (hereafter collectively referred to as Baker) question the chancellor's finding that the parties' lease agreements, particularly the MFN clause, are unambiguous, and as a matter of law, reflect the parties never intended the car-rental leases to be automatically extended by a competing company's separate and later lease.

The chancellor relied heavily on the case of *Eveleth Taconite Co. v. Minnesota Power & Light Co.*, 221 N.W. 157 (Minn. 1974), where the Minnesota Supreme Court was faced with a similar issue. There, Eveleth Taconite Company entered into two contracts that called for the Minnesota Power & Light Company to provide all necessary electric power to Eveleth's plant and mine. Both companies settled on a three-year contract for providing power to Eveleth's plant, and a five-year contract for providing power to its mine. The contracts contained a MFN clause which provided as follows:

> Company [defendant Minnesota Power] agrees that, if at any time during the term of this agreement it has in effect an agreement which gives or grants to any other customer,

similarly engaged in the taconite industry and who receives the same class and type of electric service as Eveleth Taconite Company, more favorable treatment for the purchase of said electric service or otherwise gives or grants to any such customer more favorable price, terms or conditions, with respect to said other customer's purchase of said electric service, Company shall notify Eveleth Taconite Company in writing with respect to said more favorable treatment, price, terms or conditions and said Eveleth Taconite Company, at its election, may request Company to substitute for this agreement such more favorable agreement in its entirety or on an equivalent basis to amend this agreement to give effect to such substitution.

Subsequent to the signing of Eveleth's contracts, Minnesota Power executed contracts with other taconite producers, and the terms and conditions of those contracts were the same as Eveleth's except they were for a period of ten years, and being later in time contained different termination dates. When the time came for cancellation of Eveleth's contracts, Eveleth insisted the MFN clause in its contracts entitled it to the same termination date as that contained in the longest contract in which Minnesota Power had entered with other taconite producers. Without this requested extension of its term of contract, Eveleth was required to pay a higher rate for electricity than that paid by the other competing companies. The Minnesota Supreme Court rejected Eveleth's contention and gave the following reasoning:

> In our judgment, there is little doubt that the parties intended that *the most-favored-nations clause would protect plaintiff [Eveleth] from being placed in a noncompetitive position* by provisions in its contracts with defendant [Minnesota Power], including the price of its electricity, which were less advantageous than provisions its competitors might be granted by defendant at a later time *during the agreed-upon span of plaintiff's contracts. We do not believe that the period of duration of the contract was intended to be included in the phrase* "terms or conditions" *because to do so would create a situation in which the contract could be indefinitely extended at plaintiff's election if defendant continued to enter contracts with other taconite companies. In other words, these contracts would be perpetual if defendant entered other agreements with taconite producers because plaintiff, if it so chose, could continually assume the longer term of those contracts.* That result appears inconsistent with the intent of the parties, particularly in light of the evidence concern-

ing the pre-contract negotiations in which plaintiff success-fully resisted defendant's preference for a 10-year contract. In addition, the fact that the most-favored-nations clause uses the two separate phrases, "term" and "terms or conditions," in different parts of the clause and in different contexts, gives further evidence that the parties intended those words to have different meanings. (Emphasis added.)

■ Like the holding in the *Eveleth* case, the chancellor here simply determined that, when construing the MFN clause in Baker's and the Commission's 1971 lease agreement, the parties never intended the length of their agreement would be extended. In fact, the 1971 lease contained another provision separate from the MFN clause that established (1) a ten-year term commencing with August 24, 1971, and (2) a renewable period of ten years upon the same terms and conditions. No language in either the length-of-term provision or the MFN clause of the 1971 lease specifically provided for an automatic extension of Baker's lease term for any reason. To accept Baker's argument that its lease should be "auto-matically extended" requires one to rewrite the parties' agreement, which we refuse to do. Also, if we were to approve Baker's "auto-matic extension" theory, these car-rental leases would be perpetual, since Baker would continually assume the longer lease term given any existing or new competitor. Our court of appeals has held a lease provision will not be construed as conferring a right to a perpetual renewal unless the language is so plain as to admit of no doubt of the purpose to provide for perpetual renewal. *Pults* v. *City of Springdale*, 23 Ark. App. 182, 745 S.W.2d 144 (1988). That holding makes sense, is applicable here and negates Baker's theory because the plain wording of the 1971 lease provides for no auto-matic term extensions.

Baker suggests its 1971 lease is ambiguous, and the chancellor erred in not finding so. Baker points to parole evidence it offered to show the Commission had long manifested an intention to treat car-rental concessionaires equally and to have uniform commence-ment and termination dates for all such concessionaires. Again, uniform termination dates were never mentioned in the Baker/ Commission lease, nor was there any language providing for auto-matic term extensions for any reason.

In fact, a fair reading of the MFN clause of the Baker/Com-

mission 1971 lease reflects merely that the Commission could not give concessions, containing more favorable terms and conditions, to other car-rental operations. Under this provision, Baker had every right to enforce its contractual rights when it received disparate treatment, but it never did so until after its lease expired. Having delayed such action, Baker now argues its 1971 lease should be construed to mean it had been automatically extended when Budget's 1986 lease was executed, thus making Baker's expiration date to be 2006, rather than the 1991 date actually provided in Baker's lease.

In sum, Baker, under the plain language of its 1971 lease, could have negotiated or filed suit in an effort to enforce its rights under the MFN clause, but it simply failed to do so. The chancellor was correct in her holdings — the 1971 lease was free of ambiguity, extrinsic evidence was irrelevant, and when construing the entire agreement, the MFN clause in Baker's lease did not automatically extend the termination date to coincide with the termination date of the Budget lease.

Finally, we consider Baker's argument that, aside from the trial court's ruling regarding the MFN clause issue, the trial court erred in refusing to reach Baker's other argument that the commission's proposed new lease constituted an illegal exaction because it contained an unlawful new rental rate based upon each concessionaire's gross receipts. The chancellor reasoned that, because Baker continued to operate under a year-to-year agreement and had not, as yet, executed the Commission's proposed new lease agreement containing the asserted unlawful rental rate, it would be merely advisory on the chancellor's part to decide the rental rate issue.[3] We agree. Suffice it to say, courts do not sit for the purpose of determining speculation and abstract questions of law or laying down rules for the future conduct of individuals in their business and social relations. *Micklish* v. *Grand Lodge of the Loyal Star*, 162 Ark. 71, 25 S.W. 353 (1924); *see also Andres* v. *First Ark. Development Finance Corp.*, 230 Ark. 594, 324 S.W.2d 97 (1959). Because this issue presented by Baker depends on a state of facts which is future,

---

[3] We note that intervenor appellants National Car Rental and Hertz also have never signed the Commission's proposed lease.

contingent, or uncertain, we agree with the chancellor that it would be premature and advisory to render a decision at this time.

Special Justice JAMES A. ROSS, JR., joins this opinion; Special Chief Justice JOSEPHINE L. HART, NEWBERN and BROWN, JJ., dissent; JESSON, C.J., and DUDLEY, J., not participating.

DAVID NEWBERN, Justice, dissenting. The words of a contract are to be taken and understood in their plain meaning. *First Nat. Bank of Crossett v. Griffin,* 310 Ark. 164, 832 S.W.2d 816 (1992), *cert. denied,* 507 U.S. 919 (1993), appeal after remand, 318 Ark. 848, 888 S.W.2d 306 (1994); *Farm Bureau Mut. Ins. Co. of Arkansas, Inc. v. Milburn,* 269 Ark. 384, 601 S.W.2d 841 (1980). To hold that the term (duration) of a contract is not one of its terms and conditions raises legal sophistry to a new level.

The evidence before the Chancellor included J. Dan Baker's affidavit and the deposition of Harry Don Denton, assistant manager of the airport. Mr. Baker stated his intention was that the duration of the 1971 concession agreement was to be one of the terms and conditions subject to the "most-favored-nation clause." Mr. Denton stated that, when the car-rental concession agreements were entered in 1971, all were of the same duration. At one point of his deposition, as abstracted, Mr. Denton also said:

> My concern was generated as a result of the words in the contract with really little understanding of the concept of the most favored nation clause. There were two principal concerns: one, the actual reading of the sentence. The words in the contract implied to me that terms and conditions meant what it said.

His other principal concern was the other facilities contracts at the airport which had similar terms. He said the "[i]ntention of the 7/94 agreement was to have all the concessionaires sign new agreement[s] to eliminate the controversy over varying maturities."

The Airport Commission has entered an agreement with Budget with rental rate terms more favorable to Budget than those it now wishes to impose on the other concessionaires. The Budget lease was apparently entered without consideration of the fact that its duration exceeded the durations of the leases to the other concessionaires and might well violate the provision prohibiting the Airport Commission from granting to Budget terms and conditions

more favorable than those granted to Baker and the others.

In *Eveleth Taconite Co.* v. *Minnesota Power & Light Co.,* 221 N.W.2d 157 (1974), the Minnesota Supreme Court rejected the invitation to define the meaning of "terms or conditions" in the context of whether it includes "term" or duration of the contract in all fact situations. The "most favored nation clause" in that contract provided, "if at any time *during the term of this agreement* it [the electric company] has in effect an agreement which gives or grants to any other customer ... more favorable treatment ... or otherwise *gives or grants* to any such customer *more favorable price, terms or conditions ..."* Eveleth would be entitled to obtain the same terms [emphasis by the Court]. Explaining its decision to differentiate the two references to "term" and "terms and conditions" in the case before it, the Court said:

> In our judgment, there is little doubt that the parties intended that the most-favored-nations clause would protect plaintiff from being placed in a noncompetitive position by provisions in its contracts with defendant, including the price of its electricity, which were less advantageous than provisions its competitors might be granted by defendant at a later time during the agreed-upon span of plaintiff's contracts. We do not believe that the period of duration of the contract was intended to be included in the phrase "terms or conditions" because to do so would create a situation in which the contract could be indefinitely extended at plaintiff's election if defendant continued to enter contracts with other taconite companies. In other words, these contracts would be perpetual if defendant entered other agreements with taconite producers because plaintiff, if it so chose, could continually assume the longer term of those contracts. That result appears inconsistent with the intent of the parties, particularly in light of the evidence concerning the pre-contract negotiations in which plaintiff successfully resisted defendant's preference for a 10-year contract. In addition, the fact that the most-favored-nations clause uses the two separate phrases, "term" and "terms or conditions," in different parts of the clause and in different contexts, gives further evidence that the parties intended those words to have different meanings."

To begin, the article of the contract before us containing the "most-favored-nation clause," Article I.C.3., does not have in it both "term" and "terms and conditions." Their appearance together in Article V having to do with the duration of the agreement is virtually irrelevant to the "most-favored-nation clause." This difference robs the *Eveleth* case of much of its precedential value for this case. In addition, we have here no negotiating history of either party seeking leases of longer duration in 1971. To be noted carefully is the Minnesota Supreme Court's recognition that the lease in question would be perpetuated only to the extent that other leases were entered with longer terms.

The fear of "perpetual" agreements is ill-founded. There is nothing perpetual about the Budget lease. Honoring the "most-favored-nation clause" will not extend the Baker lease beyond the term of the Budget lease. As long as the Airport Commission remembers not to enter any other leases with durations past 2006, the leases of the other concessionaires will not endure beyond that point.

The Airport Commission has made a mistake and has placed itself in a position of having to violate its agreement with its concessionaires in order to institute concessionaire rental rates more favorable to it. While it may, perhaps, be able to extricate itself from that position through negotiation with the concessionaires, it should not be allowed to do so by tortured interpretation of plain contract language.

I respectfully dissent.

BROWN, J., and Special Chief Justice JOSEPHINE L. HART, join.